5 361.
5 551
15* 473
18* 43

# UNITED STATES, COMPLAINANT, v. CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS AND OTHERS, RESPONDENTS.

CONTRACT, LAW IMPAIRING OBLIGATION OF.—An act of the territorial legislature of Utah, approved January 19, 1855, incorporated the Church of Jesus Christ of Latter-Day Saints, and conferred upon the corporation extraordinary powers, some of which the legislature possessed for the purposes of government; *held*, that the charter was accepted, subject to the right of Congress to disapprove of the law, and such disapproval was not a law impairing the obligation of a contract.

ID.—IMPLIED APPROVAL.—An act of Congress, approved July 1, 1862, repealed portions of the act of the territorial legislature above; *held*, that this was not an implied approval of the remainder of the act, and that the remainder did not become a law of Congress.

CHARTER—POWER OF CONGRESS TO ANNUL CHARTER AND TO DISSOLVE CORPORATION.—Congress had power by an act in force, March 3, 1887, to annul the remainder of the law incorporating said church, and the power to dissolve the said corporation necessarily follows therefrom.

CORPORATION—FORFEITURE OF PROPERTY HELD IN VIOLATION OF LAW. —Property acquired and held by said church in violation of the act of Congress, approved July 1, 1862, is subject to forfeiture and the escheating thereof does not interfere with any vested right.

ID.—PRACTICE—APPOINTMENT OF RECEIVER.—A bill in chancery praying the appointment of a receiver, on the ground that said church corporation acquired and held certain real and personal property in violation of law, and that said corporation was dissolved, and that said church and the other defendants were holding, possessing and using said real estate, and applying to its and their own use the rents, issues and profits thereof, and that there was no person lawfully authorized to take charge of said real estate, or personal property formerly owned by said church, and that said property is subject to irreparable loss and destruction; *held*, that the allegations of the bill were sufficient to authorize the appointment of a receiver.

ID.—STIPULATION OF FACTS ON MOTION FOR A RECEIVER.—From the stipulation of facts upon motion for a receiver, it appeared that the defunct corporation and its agents had in their possession real property in value far exceeding the limit fixed by the act of Congress of July 1, 1862, the title to a large portion of which was acquired subsequently to July 1, 1862, and that a portion of it was not held for the purpose of the worship of God, or for par-

sonages or burial ground; *held,* that the facts were sufficient to
authorize the appointment of a receiver.

MOTION for the appointment of a receiver under an orig-
inal bill in chancery, filed in the supreme court of Utah
territory, in pursuance of the act of Congress of March 3,
1887, commonly known as the "Edmunds-Tucker law."

The bill contained the allegations, which are stated at
length in the opinion, and prayed a discovery from defend-
ants, who were the trustee and twelve assistant trustees,
the appointment of a receiver, a decree annulling the
charter and dissolving the corporation, and other relief.

To this bill the defendants demurred on the following
grounds:

1. That said supreme court of the territory of Utah has
no jurisdiction of or over said defendants, or either of them
or of the subject-matter of said action.

2. That the acts of Congress of July 1, 1862, and of
March 3, 1887, referred to in plaintiff's bill of complaint,
or so much of said acts as attempt or pretend to dissolve
the said defendant corporation, or to interfere with or
limit its right to hold property, or which attempt to es-
cheat the same or to wind up its affairs, are unconstitu-
tional and void.

3. That said complaint does not state facts sufficient to
constitute a cause of action.

4. That the plaintiff has not in and by its said bill of
complaint made or stated such a case as entitles it in a
court of equity to any discovery from these defendants, or
either of them, or to any relief against them, or either of
them, as to the matters contained in the said bill of com-
plaint, or any of such matters, and that said bill of com-
plaint does not contain any matter of equity whereon
this court can ground any decree or give to the plaintiff
any relief against these defendants, or either of them.

The demurrer and the motion for a receiver were ar-
gued together. The other facts and the portions of the
laws that are relevant to the case are found in the
opinion.

The cause was argued orally in the supreme court.

Mr. *George S. Peters*, Mr. *Henry W. Hobson*, and Mr. *William J. Clarke*, for the complainant.

Mr. *J. O. Broadhead*, Mr. *J. E. McDonald*, Mr. *F. S. Richards*, Mr. *Le Grand Young*, and Messrs. *Sheeks & Rawlins*, for the defendants.

Zane, C. J.:

The complainant filed in this court its bill in chancery under an act of Congress in force March 3, 1887. The bill prayed that a decree be made by this court forfeiting the charter and dissolving the corporation known as the "Church of Jesus Christ of Latter-Day Saints," as well as for the appointment of a receiver of the assets of the corporation, until disposition could be made thereof according to law, and for other relief. The motion for the appointment of a receiver is now submitted for our decision, on the bill and the facts as stated in a stipulation entered into by the parties and filed in the case.

On the eighth day of February, 1851, the assembly of the so-called State of Deseret, afterwards organized as the Territory of Utah, passed an ordinance incorporating the Church of Jesus Christ of Latter-Day Saints. After the organization of the territory of Utah, this ordinance was re-enacted January 19, 1855, by the legislature and approved by the governor of the territory. This is the charter in question. Its terms are as follows:

"An ordinance incorporating the Church of Jesus Christ of Latter-Day Saints.

"Section 1. Be it ordained by the general assembly of the state of Deseret, that all that *portion* of the *inhabitants of said state* which now are, or hereafter may become, residents therein, and which are known and distinguished as 'The Church of Jesus Christ of Latter-Day Saints,' are hereby incorporated, constituted, made, and declared a body corporate, with perpetual succession, under the original name and style of 'The Church of Jesus Christ of Latter-Day Saints,' as now organized with *full power* and authority to *sue and be sued*, defend and be defended, in all courts of law or equity in this state; to establish,

order, and regulate worship; and *hold* and *occupy real* and personal *estate,* and have and use a seal, which they may alter at pleasure.

"Sec. 2. And be it further ordained that said body or church as a religious society, may at a general or special conference elect one 'trustee in trust,' and not to exceed twelve assistant trustees, to *receive, hold, buy, sell, manage, use,* and *control* the *real* and personal property of said church, which said property shall be *free* from *taxation;* which trustee and assistant trustees, when elected or appointed, shall give bonds, with approved security, in whatever sum the said conference may deem sufficient, for the faithful performance of their several duties; which said bonds, when approved, shall be filed in the general church recorder's office, at the seat of general church business, when said bonds are approved by said conference; and said trustee and assistant trustees shall continue in office during the pleasure of said church; and there shall also be made, by the clerk of the conference of said church, a certificate of such election or appointment of said trustee and assistant trustees, which shall be recorded in the general church recorder's office, at the seat of general church business; and when said bonds are filed, and said certificates recorded, said trustee or assistant trustees may receive property, *real or personal,* by gift, donation, bequests, or in any manner, not incompatible with the *principles of righteousness* or the *rules of justice;* inasmuch as the same shall be *used, managed,* or *disposed* of for the *benefit, improvement, erection* of *houses* for *public worship* and *instruction,* and the *well-being* of said church.

"Sec. 3. And be it further ordained that, as said church holds the constitutional and original right, in common with all civil and religious communities, 'to worship God according to the dictates of conscience;' to reverence communion agreeably to the principles of truth, and to *solemnize marriage compatible with the revelations of Jesus Christ*—for the security and full enjoyment of all blessings and *privileges embodied* in the *religion of Jesus Christ,* free to all, it is also declared that said church does

and shall possess and enjoy continually the power and authority, in and of itself, to originate, make, pass, and establish *rules, regulations, ordinances, laws, customs,* and *criterions,* for the good order, safety, *government,* convenience, comfort, and control of said church, and for the punishment or forgiveness of all offenses relative to fellowship, according to church covenants; that the pursuit of *bliss,* and the *enjoyment of life,* in every *capacity* of *public association* and *domestic happiness, temporal expansion,* or *spiritual increase upon the earth, may not legally be questioned;* provided, however, that each and every act or practice so established, or adopted for law or custom, shall relate to solemnities, sacraments, ceremonies, *consecrations, endowments, tithings, marriages, fellowship,* or the religious duties of man to his Maker; inasmuch as the doctrines, principles, practices, or performances support virtue and increase morality, and are not inconsistent with or repugnant to the Constitution of the United States, or of this state, and are founded in the revelations of the Lord.

"Sec. 4.    And be it further ordained that said church shall keep at every fully organized branch or stake, a registry of marriages, births, and deaths, free for the inspection of all members, and for their benefit.

"Sec. 5.    And be it further ordained that the presidency of said church shall fill all vacancies of the assistant trustees, necessary to be filled until superseded by the conference of said church.

"Sec. 6.    Be it further ordained that no assistant trustee or trustees shall transact business in relation to buying, selling, or otherwise disposing of church property, without the consent or approval of the trustee in trust of said church."

The purposes of the corporation as indicated by the powers conferred upon it by this charter are numerous and varied.    Some of them, it is true, are expressed in vague terms; but the capacity is granted to act in various ways, and to make laws and regulations with respect to very many subjects.    The corporation is confined to no particular purpose.    No precedent can be found for conferring

upon a private corporation such a variety of capacities. Some of them, it is believed, are above the reach of human laws. The law-making power of the state, for the purpose of better government and for the public good, enacts charters conferring a portion of the powers intrusted to it upon the people of a city or village; others authorizing charitable, educational, or religious institutions; and others providing for various pursuits and enterprises. These artificial agencies are provided in order that the people may more conveniently and successfully co-operate for the good of all, and for the advancement of human happiness.

The charter of a corporation should always specify the purpose for which the corporation is organized, and powers adapted to that purpose should be granted. If the corporation is to be a public one, powers adapted to the regulations of conduct and to public purposes should be given, with such incidental capacity to do business as may be essential to such an organization, and no more. It should never be allowed to engage in general business. If a charter authorizes the organization of a company to acquire and operate a railroad, the power to engage in agriculture should not be granted also. So, if a worshiping congregation should desire to purchase a lot of ground, and to build a church and a parsonage, and to employ a minister, the charter should authorize the corporation to do so, but should not confer upon such an organization powers adapted to municipal government, or to the purchase and sale of real and personal property without limit, nor should such corporations engage in general business.

It is an accepted doctrine that the common weal demands that private corporations should be limited each to a particular and specified purpose. Even when so limited they often acquire great influence. If the legislature, by the instrumentality of the same charter, may authorize the organization of a company for all purposes, if the company may enter upon every field of enterprise, and engage in every pursuit, and may also control human conduct by means of the powers of a municipal government, and at the same time may possess those of a religious corpora-

tion, such corporate influence will be manifested as never before. The charter of the Church of Jesus Christ of Latter-Day Saints is most extraordinary in the extent of the authority it assumes to confer upon, and in the number, the variety, and the scope of the powers it places in the hands of, a religious body. It declares, in effect, that all the Mormon people, who at the time of its enactment were, or who might afterwards become, residents of the territory, are a body corporate, with perpetual succession.

This corporation, at the time of its organization, embraced nine-tenths of the inhabitants of the territory—many thousands of people. At the present time it includes probably more than 120,000, and if, in the future, people should continue to be gathered in from all quarters of the globe as they have in the past, their number at no distant day will reach a quarter of a million. The corporation extends over the whole territory, including numerous congregations in various localities. At the head of this corporate body, according to the faith professed, is a seer and revelator, who receives in revelation the will of the infinite God concerning the duty of man to himself, to his fellow-beings, to society, to human government, and to God. In subordination to this head are a vast number of officers of various kinds and descriptions, comprising a most minute and complete organization. The people comprising this organization claim to be directed and led by inspiration that is above all human wisdom, and subject to a power above all municipal government—above all "man-made laws." These facts belong to history, therefore we have taken notice of them.

Upon such a religious organization as this, unusual and extraordinary powers are conferred by this charter, such as the right of acquiring and disposing of real and personal property without limit, and with exemption from taxation; the authority to solemnize marriage according to revelation; the continuous and inherent authority to make laws and "criterions" for the good order, safety, government, convenience, comfort, and control of the church, which is equivalent to saying the Mormon people; also for

the punishment or forgiveness of all offenses relative to fellowship, according to church covenants—that is to say, the church may impose or inflict any punishment, if according to its covenants; what those covenants may be the public may not know. Further, it is declared that the enjoyment of life in every capacity of public association, domestic happiness, and temporal expansion upon the earth, may not legally be questioned. Here is a wide field of human conduct for a government to agree not to question. Human beings have the capacity to associate publicly for very many purposes, and such association may become disorderly, and require legal control. In "domestic happiness" this church professes to believe is included polygamy; in the estimation of others, domestic happiness might include some other practice injurious to society. In the same manner "temporal expansion" might take a direction requiring control. This grant of power was followed by a proviso that the laws and customs established should "relate to solemnities, sacraments, ceremonies, consecrations, endowments, tithing, marriages, fellowship, or the religious duties of man to his Maker; and that the same support virtue and increase morality, and are not inconsistent with or repugnant to the constitution of the United States or of this state, and are founded in the revelations of the Lord."

The above terms, "solemnities, sacraments, ceremonies, consecrations, and endowments" may be polygamy and unlawful cohabitation in disguise; in fact marriage is included in terms in the charter, without specification of the kind of marriage. This is probably the first time that any legislature committed the regulation of marriage and tithing to a private corporation. It is safe to assume that the right to regulate such matters was never before attempted to be contracted away to a church or any other body of men. Nor are we aware that the right to regulate man's duty to his Maker was ever included in a contract. And, finally, this charter provides that such laws and customs shall be founded in the revelations of the Lord. This too, probably, is the first time that a legislature expressly limited the rules and laws that a corporation might make

by the revelations of the Lord, and make a grant thereof to any person, natural or artificial.

In this charter the respondent insists the church gained a vested right upon its acceptance, and that Congress has no power to disapprove or to annul it. We know of no precedent for holding that a corporation could obtain a vested right in a charter like this. Had the territorial legislature the power to grant a vested right to such a charter? The case of *Dartmouth College* v. *Woodward,* 4 Wheat., 518, has been regarded as settling the question that the charter of a private corporation constitutes a contract between a state and the corporation. By this contract the corporation, in consideration of presumed benefits to the public, obtains a vested right in the charter, unless the constitution or a general law of the state, or the charter itself, reserves the right to amend or appeal. But we find no case holding that a charter granted by the legislature of a territory gives such a vested right.

Again, it will be found, we think, that the powers granted by a state in such charters were limited to some particular purpose; that they did not embrace powers which the legislature possessed for the purpose of government, to be exercised by that body alone, or conferred upon some municipal government for the same purpose. Such powers are never granted by the people to the legislature to be bartered and sold. A government based upon the will of the people must ever keep such authority within reach of the people's will. Legislatures are but the agents of the people, with authority to make laws within constitutional limits, but without authority to give or to contract away powers to make laws to govern the people so that private parties may gain vested rights in them. The charter in question assumes to grant to the corporation power to make regulations and laws with respect to marriage, tithing, fellowship, etc. It confers in express terms upon the church power and authority to originate, make and pass rules, regulations, ordinances and to establish customs and "criterions," for the government, convenience, and control of the church, (which means the whole Mormon population of the territory,) as well as the right to acquire by purchase

or otherwise real and personal property, and to sell or dispose of it at pleasure. Such are some of the powers conferred upon this church corporation by this remarkable act. To such a charter it is claimed the church has acquired a vested right. If this proposition is sound the corporate body known as the "Church of Jesus Christ of Latter-Day Saints" may endure under this charter to distant ages. But we are of the opinion that a vested right could not be acquired in such a charter.

Further, Congress possesses the power to enact laws for the government of the territories. It may make provision for territorial governments, and extend the authority of territorial legislatures to all rightful subjects of legislation. Such territorial governments occupy towards Congress something of the same relation as municipalities—such as city governments—fill towards the state legislatures. A state legislature can repeal the charter of a municipal government, and the ordinances passed under it; so Congress can repeal the organic act of a territory, and all territorial enactments, in pursuance of the organic act. Congress is the soverign power to legislate for the territories, and all charters from territorial legislatures must be held to have been accepted with the knowledge that Congress possessed the authority to change or repeal the law creating them. In the case of *Bank* v. *Yankton*, 101 U. S., 129, the court said: "The territories are but political subdivisions of the outlying dominion of the United States, * * * and Congress may legislate for them as a state does for its municipal organizations. * * * In the organic act of Dakota there was not an express reservation of power in Congress to amend the acts of the territorial legislature, nor was it necessary. Such a power is an incident of sovereignty, and continues until granted away. Congress may not only abrogate laws of the territorial legislature, but it may itself legislate directly for the local government. It may make a void act of the territorial legislature valid, and a valid act void. In other words, it has full and complete legislative authority over the people of the territories, and all the departments of the territorial governments. It may do for the territories what the people, under the constitu-

tion of the United States, may do for the states." This we
conceive to be the law upon the subject.

In the case under discussion the territory was organized
under the organic act approved September 9, 1850. Among
other provisions is the following: "That the legislative
power of said territory shall extend to all rightful subjects
of legislation consistent with the constitution of the United
States and the provisions of this act. * * * All the
laws passed by the legislative assembly and governor shall
be submitted to the Congress of the United States, and, if
disapproved, shall be null and of no effect. The charter in
question was a law passed by the legislative assembly, and
the right to disapprove of it was expressly reserved, and
the church must be held to have accepted it with the
knowledge of the reserved right of disapproval. That be-
ing so, the church will not be heard to say that it was ac-
cepted without conditions. In order to maintain that the
charter, when accepted, became a contract binding on Con-
gress, it is necessary to assume that the acceptance was un-
conditional; otherwise it is simply an act of the legislature
giving to the corporation the use of the authority contained
in it during the pleasure of Congress. The acceptance of
the charter subject to disapproval could make the charter
no more than a license to the corporation to use the author-
ity granted during the pleasure of Congress.

We are of the opinion, therefore, from a view of the
whole subject, both from the nature of the powers granted
by the charter itself, and from the form of the grant and
of the acceptance, that the acceptance did not give the
corporation a vested right in it.

But, assuming that the acceptance of the charter did not
give a vested right in it, the claim is made that the second
section of an act of Congress approved July 1, 1862, made
the charter, as thereby limited, a law of the United States,
and not subject thereafter to disapproval or repeal. The
section is this:

"Sec. 2. And be it further enacted, that the following
ordinance of the provisional government of the state of
Deseret, so-called, namely: 'An ordinance incorporating
the Church of Jesus Christ of Latter-Day Saints,' passed

February 8, 1851, and adopted, re-enacted, and made valid by the governor and legislative assembly of the territory of Utah by an act passed January 19, 1855, entitled 'An act in relation to the compilation and revision of the laws and resolutions in force in Utah territory, their publication and distribution,' and all other acts and parts of acts heretofore passed by the said legislative assembly of the territory of Utah, which establish, support, maintain, shield or countenance polygamy, be and the same hereby are dissapproved and annulled: provided, that this act shall be so limited and construed as not to affect or interfere with the right of property legally acquired under the ordinance, heretofore mentioned; nor with the right 'to worship God according to the dictates of conscience,' but only to annul all acts and laws which establish, maintain, protect, or countenance the practice of polygamy, evasively called 'spiritual marriage,' however disguised by legal ecclesiastical solemnities, sacraments, ceremonies, consecrations, or other contrivances."

In the enacting clause of this section the charter in question, termed "An ordinance incorporating the Church of Jesus Christ of Latter-Day Saints," is repealed in express terms; but the proviso limits the effect of the entire act in these respects: *First,* so that it shall not affect the right to property legally acquired under the charter; *second,* so as not to interfere with the right to worship God according to the dictates of conscience; *third,* so as to annul only all acts and laws which establish, maintain, protect, or countenance the practice of polygamy, evasively called "spiritual marriage," however disguised by legal or ecclesiastical solemnities, sacraments, ceremonies, consecrations, or other contrivances. The enacting clause was not limited by the proviso in the two respects first mentioned, because that clause simply repealed the charter without interfereing with the rights of property which had been acquired under it, nor did it interfere with the right to worship God according to the dictates of conscience. And it is not clear that the third limitation mentioned left standing any portion of the charter; for it is expressly stated that the intention of the law was to annul all laws countenancing polygamy or spiritual marriage, though appearing in the law

disguised by the name of a solemnity, a sacramant, a cere-
mony, a consecration, or under any other contrivance; and
under just such marks as these, we think, polygamy does
appear in the charter of the Church of Jesus Christ of Lat-
ter-Day Saints.   With all such disguises and contrivances
stripped from this charter, little, comparatively speaking,
is left of it.

But assuming that the expressed intent to annul all acts
countenancing polygamy left other provisions in force, was
the remainder of the charter made an act of Congress?
Such an intention is not expressed.   It must have been so
made by implication.   From the provisions of the act of
1862 it is clear that Congress did not regard the charter as
a contract, otherwise it would not have changed its pro-
visions.   We may assume that Congress changed the char-
ter according to its conceptions of duty at the time, with
the understanding that it might be changed further, or
altogether disapproved, whenever in the opinion of Con-
gress the good of society required such change or disap-
proval.   We do not think that the act of Congress of 1862
affords the inference that so much of the charter as re-
mained in force was in effect a law of the United States.
This view seems to be in accordance with the opinion of
the supreme court of the United States in the case of *Bank*
v. *Iowa*, 12 How., 1.   The territorial legislature of Wis-
consin chartered the Miners' Bank.   Afterwards an act of
Congress annulled the charter in certain particulars, but
left other of its provisions in force.   Thereafter the terri-
tory was divided by act of Congress, and the territory of
Iowa was erected over that part of the former territory of
Wisconsin in which the bank was situated.   Later, the
territorial legislature of Iowa repealed the charter, and di-
rected the settlement of the affairs of the corporation by
trustees under the supervision of the court.   A *quo war-
ranto* proceeding was instituted against the bank.   In de-
ciding the case on appeal the court used this language:
"It has been argued in this case that as Congress, in
creating the territorial government of Wisconsin and Iowa,
reserved to themselves the power of disapproving and
thereby annulling the acts of those governments, and had,

in the exercise of that power, stricken out several of the provisions of the charter of the Bank of Dubuque, enacted by the legislature of Wisconsin, assenting to the residue, that therefore the charter of this bank should be regarded as an act of Congress rather than of the territorial government. * * * Congress, in creating the territorial governments, and in conferring upon them powers of general legislation, did not, from obvious principles of policy and necessity, ordain a suspension of all acts proceeding from those powers, until expressly sanctioned by themselves, while, for considerations equally strong, they reserved the power of disapproving or annulling such acts of territorial legislation as might be deemed detrimental. * * * The charter of the Bank of Dubuque, enacted in all its details and powers ever possessed by it, (and according to which it was in fact organized,) by the legislature of Wisconsin, must be looked upon as the creature of that legislature."

The seventeenth section of the act of March 3, 1887, under which this bill is filed, is as follows:

"Sec. 17. That the acts of the legislative assembly of the territory of Utah incorporating, continuing, or providing for the corporation known as the "Church of Jesus Christ of Latter-Day Saints," and the ordinance of the so-called general assembly of the state of Deseret, incorporating the Church of Jesus Christ of Latter-Day Saints, so far as the same may now have legal force and validity, are hereby disapproved and annulled, and the said corporation, in so far as it may now have, or pretend to have, any legal existence, is hereby dissolved; that it shall be the duty of the attorney general of the United States to cause such proceedings to be taken in the supreme court of the territory of Utah as shall be proper to execute the foregoing provisions of this section, and to wind up the affairs of said corporation conformably to law; and in such proceedings the court shall have power, and it shall be its duty to make such decree or decrees as shall be proper to effectuate the transfer of the title to real property now held and used by said corporation for places of worship, and parsonages connected therewith, and burial grounds, and of the description mentioned in the proviso to section thir-

teen of this act, and in section twenty-six of this act, to
the respective trustees mentioned in section twenty-six of
this act; and for the purposes of this section said court
shall have all the powers of a court of equity."

The power of Congress to dissolve the corporation
styled the "Church of Jesus Christ of Latter-Day Saints"
necessarily follows the right to annul its charter, which
we have held could be done. This disposes of the ques-
tion raised upon the first clause of the seventeenth sec-
tion of the act.

The last clause of that section should be considered in
connection with sections 13 and 26 of the same act. They
are as follows:

"Sec. 13. That it shall be the duty of the attorney gen-
eral of the United States to institute and prosecute
proceedings to forfeit and escheat to the United States
the property of corporations obtained or held in viola-
tion of section three of the act of Congress approved
the first day of July, 1862, entitled 'An act to punish and
prevent the practice of polygamy in the territories of the
United States and other places, and disapproving and an-
nulling certain acts of the legislative assembly of the terri-
tory of Utah,' or in violation of section eighteen hundred
and ninety of the Revised Statutes of the United States;
and all such property so forfeited and escheated to the
United States shall be disposed of by the secretary of the
interior, and the proceeds thereof applied to the use and
benefit of the common schools in the territory in which
such property may be: provided, that no building, or the
grounds appurtenant thereto, which is held and occupied
exclusively for purposes of the worship of God, or par-
sonage connected therewith, or burial ground, shall be for-
feited."

"Sec. 26. That all religious societies, sects, and congre-
gations shall have the right to have and to hold, through
trustees appointed by any court exercising probate powers
in a territory, only on the nomination of the authorities of
such society, sect or congregation, so much real property
for the erection or use of houses of worship, and for such
parsonages and burial grounds as shall be necessary for

the convenience and use of the several congregations of such religious society, sect or congregation."

The second clause of the seventeenth section quoted makes it the duty of the attorney general of the United States to institute proceedings in this court to wind up the affairs of the corporation dissolved by the first clause of the same section, and gives the court power to make such decree as may be proper to transfer the title to real property held and used by the corporation for places of worship and parsonages connected therewith, and burial grounds, as mentioned in the proviso to section 13, and in section 26 of the same act. For the purpose of such proceeding the court is given all the powers of a court of equity. The proviso of section 13 exempts just such property as last described from forfeiture, with no limitation on value as in the act of 1862; and section 26 gives to all religious societies, sects and congregations the right to hold, through trustees nominated and appointed as therein provided, so much real property for the use of houses of worship, parsonages, and burial grounds as shall be necessary; nor is the value in this section limited. By the first part of section 13 it is made the duty of the attorney general to institute proceedings to forfeit and escheat to the United States the property of the corporation obtained or held in violation of section 3 of the act of 1862, or of section 1890 of the Revised Statutes of the United States, (which two sections are substantially the same), the property so forfeited and escheated to the United States, and the proceeds thereof are to be applied to the use and benefit of the common schools in the territory in which such property may be.

Section 3 of the act of 1862 is as follows:

"Sec. 3. And be it further enacted that it shall not be lawful for any corporation or association for religious or charitable purposes to acquire or hold real estate in any territory of the United States during the existence of the territorial government of a greater value than $50,000; and all real estate acquired or held by any such corporation or association contrary to the provisions of this act shall be forfeited and escheat to the United States: provided, that

existing vested rights in real estate shall not be impaired by the provisions of this section."

It will be seen that section 13 of the act of March 3, 1887, authorizes the forfeiture only of the property obtained or held in violation of section 3 of the act which took effect July 1, 1862; that is to say, property acquired after the act took effect and in violation of it. And we may here remark that the policy of limiting the amount of land which religious corporations may hold, is not new, but it is a practice that has obtained for ages. It was announced in *magna charta* more than 600 years ago, and continued by many enactments of parliament designed to meet the evasions and contrivances of the church, for escaping the laws. It has been the settled policy in this country, as shown by the statutes of various states, and a quarter of a century ago Congress limited the amount of real estate that any church might hold in any of the territories. It has been the settled design of such statutes to confine church holdings to the amount that is necessary simply for church purposes, and the observance of such laws has been secured by forfeiture, which seems the most appropriate and effectual method.

We are unable to discover that any of the provisions of the act of Congress of March 3, 1887, relating to the corporation of the Church of Jesus Christ of Latter-Day Saints, interferes with vested rights, or is in conflict with any provision of the Constitution of the United States.

This brings us to the question whether the allegations of the bill are sufficient to authorize the appointment of a receiver. The following facts, with others, are alleged in the bill: That the Church of Jesus Christ of Latter-Day Saints was incorporated under the act of the territorial legislature quoted, and did buy and hold large amounts of real estate and personal property of great value in the territory of Utah, after the first day of July, 1862. The precise amount, value, or description thereof the plaintiff was unable to state, but asked leave to prove, and on information and belief alleged the value of the real estate to be about $2,000,000, and the personal property to be about $1,000,000; "that the corporation of the Church of Jesus

Christ of Latter-Day Saints and the successor of John Taylor (whose name is to this plaintiff unknown) as trustee in trust, and Wilford Woodruff, Lorenzo Snow, Erastus Snow, Franklin D. Richards, Brigham Young, Moses Thatcher, Francis M. Lyman, John Henry Smith, George Teasdale, Heber J. Grant and John W. Taylor, assistant trustees, the defendants, wrongfully, and in violation of the laws of the United States, still claim to hold and do exercise the powers which were held and exercised by the said corporation of the Church of Jesus Christ of Latter-Day Saints, and are unlawfully possessing and using the real estate mentioned above, and are receiving and unlawfully applying to its and their own use the rents, issues and profits thereof, and falsely and wrongfully claim the right to sell, use, and dispose of the same. *Tenth.* That since the nineteenth day of February, 1887, there has been and is no person lawfully authorized to take charge of, manage, preserve, or control the property, real and personal, which on or before the day and year last aforesaid was held, owned, possessed and used by the corporation of the Church of Jesus Christ of Latter-Day Saints, and by reason thereof all the said property, as referred to in the third paragraph of this bill, is subject to irreparable and irremediable loss and destruction."

The reason for the statement of facts in terms so general is sufficiently apparent. When the corporation was dissolved its officers and agents no longer had any legal right to the possession of its property, to its use, to the rents and profits thereof. It further appears from the allegations of the bill that the respondents are receiving and applying to their own use the rents and profits of the property, and claiming the right to sell, use, and dispose of it. Assuming the facts to be as alleged in the bill, a portion of the property must be forfeited, and must escheat to the United States, to be applied to the use and benefit of the common schools of the territory of Utah.

"The modern English practice allowing the appointment of a receiver before answer, in cases of emergency, was adopted by the English court of chancery, and has been generally followed in this country. And it may now be

regarded as the uniform and well-established practice to entertain the application and to grant the relief before answer, where plaintiff can satisfy the court that he has an equitable claim to the property in controversy, and that a receiver is necessary to preserve it from loss, or where a clear case is shown of fraud and imminent danger, unless the relief is granted." High. Rec. (2d Ed.) sec. 105. "In all such cases a court of equity necessarily exercises a large discretion as to whether it will or will not take possession of the property by its receiver, and this discretion is governed by a consideration of all the circumstances of the case. It is therefore difficult to establish any fixed rule in such cases, although it may be said generally that if the case as presented upon the application for a receiver is clearly in favor of plaintiff, indicating that he will probably be entitled to a final recovery, the risk of injury to defendant is very small, and the court does not hesitate to interfere. If there be more doubt as to plaintiff's right, there is of course more difficulty in passing upon the application, the question being one of degree, as to which it is impossible to lay down any precise rule." Id., sec. 19; also note 1, under this section. "Where, indeed, the property is as it were *in medio,* in the enjoyment of no one, the court can hardly do wrong in taking possession. It is the common interest of all parties that the court should prevent a scramble." As in the general doctrine to the same effect, is Kerr. Rec., 1-5. We are of the opinion that the facts alleged in the bill are sufficient to authorize the appointment of a receiver according to the prayer.

A further question arises upon the stipulation of facts upon which the motion is submitted—whether these facts are sufficient to authorize the appointment of a receiver.

Among the facts contained in the stipulation on which this motion is submitted are the following:

"On the twenty-eighth day of February, 1887, John Taylor, who was then trustee in trust for the Church of Jesus Christ of Latter-Day Saints, held in trust certain personal property, goods, and chattels of the aggregate value of $268,982.39½, which it is claimed by the defendants and denied by the plaintiff, had theretofore been contributed

by the individual members of said church for the purpose of building temples, and for other charitable and religious purposes. On said last-named date the said John Taylor, as trustee in trust, executed an instrument in writing, a copy of which is hereto attached and made part hereof, marked Exhibit A. That, in pursuance of the provisions of the instrument aforesaid, certain property of the value approximately as set out below was delivered to the following named ecclesiastical church corporations created and existing under the laws of the territory of Utah:

To the Church Association of Cache Stake of Zion......$45,036 09
To the Church Association of Box Elder Stake of Zion.. 16,745 18
To the Church Association of Weber Stake of Zion...... 11,480 06
To the Church Association of Morgan Stake of Zion..... 2,716 57
To the Church Association of Summit Stake of Zion.... 3,153 20
To the Church Association of Wasatch Stake of Zion.... 6,044 90
To the Church Association of Salt Lake Stake of Zion... 32,702 70
To the Church Association of Tooele Stake of Zion...... 4,591 10½
To the Church Association of Juab Stake of Zion....... 3,049 03
To the Church Association of Utah Stake of Zion....... 25,000 00
To the Church Association of Sanpete Stake of Zion.... 6,992 13
To the Church Association of Sevier Stake of Zion..... 15,445 50
To the Church Association of Millard Stake of Zion..... 14,083 89
To the Church Association of Beaver Stake of Zion..... 6,980 36
To the Church Association of Panguitch Stake of Zion.. 8,137 50
To the Church Association of St. George Stake of Zion.. 28,638 41
To the Church Association of Kanab Stake of Zion ..... 38,185 77
Total ........................... ..........$268,982 39½

"The members of the said stake corporations are members of the Church of Jesus Christ of Latter-Day Saints, and it is claimed by the defendants and denied by plaintiffs that they were substantially the original donors of said property in their respective stakes. The Church of Jesus Christ of Latter-Day Saints was a corporation for the purposes set out in the act incorporating said church at the time the act of Congress of 1887, hereinbefore set out, took effect, and has claimed to exist as a corporation ever since that time.

"The tithing-house and grounds, as hereinbefore set out, are not, and have never been, used as a place of worship or parsonage connected therewith, or as burial ground, nor are they appurtenant to any thereof. The portion of the third tract of land set out in the first part of this agree-

ment as the 'Gardo House and Grounds,' and the historian's office and grounds, which is known as the 'Historian's Office and Grounds,' comprises a tract about 8 by 10 rods. The building thereon is a three-story *adobe* building, about 35 feet by 45 feet. The grounds of the Gardo house and the grounds of the historian's office are separated by a terrace, and for a part of the way by an evergreen hedge. The historian's office and tract has been used as the office and residence of the historian of said church, and as a depository for the records of said church, and for library purposes, and has been so used since prior to 1862. For the purpose of this motion the probable value of the real estate herein described is estimated as follows: (1) The Temple and Tabernacle block, one hundred and fifty thousand dollars; (2) the tithing-house and grounds, twenty-five thousand dollars; (3) the portion of tract three, known as the 'Gardo House and Grounds,' fifty thousand dollars; (4) the portion of tract three, known as the 'Historian's Office and Grounds,' ten thousand dollars."

From these facts it sufficiently appears that the defunct corporation has in its possession real property in value far exceeding $50,000, the limit fixed by the act of Congress of 1862, and that a portion of it is not a building or the grounds appurtenant thereto held for the purpose of the worship of God, or the parsonages connected therewith, or burial ground, and that the title to a large portion of the same property was acquired subsequently to the time the act of 1862 took effect.

In deciding this motion we are not called upon to finally determine the rights of the parties with respect to the property involved in this case. Such rights will be decided as they ultimately appear. And if the receiver appointed shall claim a right to the possession of any property as receiver, to which third parties also claim a right, the issue will then be determined. We are of the opinion that the complainant's motion for the appointment of a receiver should be allowed. An order will be made to that effect, in accordance with the prayer of the bill.

BOREMAN, J., and HENDERSON, J., concurred.